John Heenan
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Phone: (406) 839-9091
Fax: (406) 839-9092
john@lawmontana.com

Gary Lynch (*Pro Hac Vice* forthcoming)
Patrick D. Donathen (*Pro Hac Vice* forthcoming)
LYNCH CARPENTER LLP
1133 Penn Avenue
Pittsburgh, PA 15222
Phone: (412) 322-9243
Fax: (412) 231-0246
patrick@lcllp.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| JEREMIAH TOWNSEND, individually and on behalf of all others similarly situated, | Case No.: CV-24-77-BU-BMM |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| SNOWFLAKE INC.; and ADVANCE STORES COMPANY, INC., | |
| Defendants. | |

Plaintiff Jeremiah Townsend ("Plaintiff"), by his undersigned counsel, files this Class Action Complaint, individually and on behalf of a class of all similarly situated persons, against Snowflake, Inc. ("Snowflake") and Advance Stores Company, Inc. ("Advance Stores") (collectively, "Defendants"). Plaintiff alleges as follows based upon information and belief, investigation of counsel, and his own personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.    Plaintiff brings this action against Defendants for their failure to properly secure and safeguard highly valuable, protected, personally identifiable information in their possession and/or control, including, but not limited to, individuals' names, dates of birth, Social Security numbers, and driver's license or other government issued identification numbers (collectively, "PII").

2.    As Defendants are or should have been aware, this type of personal and sensitive data is highly targeted and sought after by hackers who seek to exploit that data for nefarious purposes. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to individuals including Plaintiff and the Class members.

3.    Advance Stores is a subsidiary of Advance Auto Parts, Inc. ("Advance Auto Parts") an automotive aftermarket parts provider, operating over 5,000 stores and branches across the United States, Canada, Puerto Rico, and the U.S. Virgin

Islands. Advance Auto Parts employs approximately 67,000 employees across is locations.[1] Upon information and belief, Advance Stores is the ultimate employer of individuals who work for Advance Auto Parts.

4.    During the job application process, Advance Stores collects and stores individuals' highly sensitive PII, and has a resulting duty to secure such information from unauthorized access and exfiltration.

5.    As part of its business operations, Advance Stores uses Snowflake's data cloud services to store job applicant and employee PII, including the PII of Plaintiff and Class members. Snowflake is a cloud computing-based data cloud company that provides cloud-based data storage and analytics services, generally termed "data-as-a-service" to numerous corporate customers, such as Advance Stores.

6.    Snowflake bills its services as "[a] single, fully managed platform that powers the AI Data Cloud. Snowflake securely connects businesses globally across any type or scale of data to productize AI, applications and more in the enterprise."

7.    Snowflake recognizes the responsibility of protecting the sensitive information with which it is entrusted, stating that "[s]security has been foundational to the Snowflake platform since the very beginning" and further representing that

---

[1] *Advance Auto Parts Career Site*, https://jobs.advanceautoparts.com/us/en (last visited Aug. 2, 2024).

"[s]ince our founding in 2012, security of our customers' data has been our highest priority."[2]

8.    Despite Defendants' duties to safeguard the PII entrusted to them, on or about May 23, 2024, Snowflake discovered that unauthorized third parties had gained access to certain of its customers' cloud accounts, including Advance Stores. By accessing these accounts, cybercriminals were able to steal and advertise for sale data from a significant volume of Snowflake's corporate customers, including Advance Stores (the "Data Breach" or "Breach"). Technology industry professionals have deemed this one of the largest—if not *the* largest—data breaches in history.[3]

9.    Security researchers have attributed the Data Breach to the cybercriminal gang, UNC5537, and to date have notified approximately 165 Snowflake customers that their data may have been stolen during the Data Breach.[4]

10.    A "critical factor" leading to the Data Breach was Defendants' data security policy, or lack thereof, on multifactor authentication ("MFA"). At the time

---

[2] Brad Jones, *Snowflake Security Hub*, SNOWFLAKE, https://www.snowflake.com/en/resources/learn/snowflake-security-hub/ (last visited Aug. 2, 2024).

[3] Eric Ezenwa, *Cybersecurity wake-up call: Lessons from Snowflake's massive data breach*, INTERESTING ENGINEERING (July 8, 2024), https://interestingengineering.com/culture/snowflake-billion-dollar-data-breach-cybersecurity; Matt Burgess, *The Snowflake Attack May Be Turning Into One of the Largest Data Breaches Ever*, WIRED (June 6, 2024), https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree/.

[4] Zack Whittaker, *Mandiant says hackers stole a 'significant volume of data' from Snowflake customers*, TECHCRUNCH (June 10, 2024), https://techcrunch.com/2024/06/10/mandiant-hackers-snowflake-stole-significant-volume-data-customers/

of the Data Breach, Snowflake did not at automatically enroll its customers in or require them to set up MFA to access their Snowflake accounts, and Advance Stores did not implement MFA to access its Snowflake account.[5] On July 9, 2024, over two and a half months following discovery of the Data Breach, Snowflake announced that it has given administrators of its accounts the capability to require MFA for all account users.[6]

11.    As a direct and proximate result of Defendants' failure to implement and follow basic security procedures, Plaintiff's and Class members' PII is now in the hands of cybercriminals and available for sale on the dark web.

12.    Plaintiff and Class members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

13.    As such, on behalf of himself and all others similarly situated, Plaintiff brings claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief.

---

[5] *Id.*

[6] Brad Jones and Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Blog, RESOURCES (July 9, 2024), https://www.snowflake.com/blog/snowflake-admins-enforce-mandatory-mfa.

## PARTIES

14.     Plaintiff is an adult, who at all relevant times, is and was a citizen of the State of South Carolina. Plaintiff received a notice from Advance Stores that his PII was compromised in the Data Breach.

15.     Defendant Snowflake Inc. is a Montana corporation with its principal place of business at 106 E. Babcock Street, Suite 3A, Bozeman, Montana 59715. As such, Defendant Snowflake is a citizen of the State of Montana.

16.     Defendant Advance Stores is a Virginia Corporation with its principal place of business at 4200 Six Forks Road, Raleigh, NC 27609. Defendant Advance Stores is a subsidiary of Advance Auto Parts, Inc. As such, Defendant Advance Stores is a citizen of the Commonwealth of Virginia and the State of North Carolina.

17.     Plaintiff requests leave to amend this complaint should additional defendants or causes of action become known.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

19.     This Court has general personal jurisdiction over Snowflake because Snowflake is a citizen of the State of Montana.

20.     This Court has specific personal jurisdiction over Advance Stores because Advance Stores employs a number of individuals who were impacted by the Data Breach in Montana at Advance Auto Parts stores across Montana and derives a substantial amount of revenue from its Montana business contacts. Advance Stores further has minimum contacts with Montana because it conducts substantial business in Montana.

21.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391 because Snowflake resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendants conduct substantial business within this District.

## FACTUAL ALLEGATIONS

**A.     Advance Stores Collects and Stores PII from Job Seekers and Employees.**

22.     Advance Stores is a wholly-owned subsidiary of the automotive aftermarket parts provider, Advance Auto Parts.

23.     Upon information and belief, Advance Stores is the employer of individuals who work at Advance Auto Parts stores across the country, including across the State of Montana.

24.    When individuals apply for jobs at Advance Auto Parts, job seekers are required to entrust their highly sensitive PII to Advance Stores. This PII includes, but is not limited to, names, dates of birth, Social Security numbers, and driver's license or other government issued identification numbers.

25.    When entrusting Advance Stores with their PII during the job application process, job seekers and employees reasonably expected that Advance Stores would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

26.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Advance Stores assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII from unauthorized access and/or disclosure.

27.    Plaintiff and Class members had a reasonable expectation, based in part on Advance Stores' own statements, that their PII would be protected as Advance Stores represented that it "seek[s] to use reasonable organization, technical, and administrative measures to protect Personal Information within our organization."[7] However, despite Advance Stores' stated commitment to data security, Advance

---

[7]    *Privacy Policy*, ADVANCE AUTO PARTS (Dec. 31, 2023), https://shop.advanceautoparts.com/o/privacy-notice.

Stores failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by bad actors.

**B.    Advance Stores Uses Snowflake's Data Cloud Platform to Store Job Applicants' and Employees' PII.**

28.    Upon information and belief, Advance Stores uses Snowflake's data cloud services to conduct its business operations and ultimately store the PII entrusted to it by job applicants and employees during their application process for positions with Advance Auto Parts.

29.    Snowflake is a cloud computing-based data company. Snowflake's cloud computing platform allows its customers to store, process, and analyze data in a single place.

30.    Snowflake is one of the largest data cloud platform providers on the market, claiming "thousands of organizations around the world" as its customers. Since its incorporation, Snowflake has acquired more than a dozen companies to bolster its service offerings and has opened over 45 corporate offices around the globe.[8]

31.    During the regular course of providing its data cloud platform to its customers, including Advance Stores, Snowflake is provided and entrusted with individuals' PII, including that of Plaintiff and Class members. As Snowflake itself

---

[8] *Fast Facts*, SNOWFLAKE (April 30, 2024), https://www.snowflake.com/wp-content/uploads/2021/05/SnowflakeFastFactsSheet.pdf.

has stated, "Snowflake manages all aspects of how this data is stored—the organization, file size, structure, compression, metadata, statistics, and other aspects of data storage are handled by Snowflake."[9]

32.    As a major provider of cloud computing services, Snowflake advertises that it "sets the standard for data security" and further represents that its cloud computing platform "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data." Snowflake also states that its "security architecture is completed by the monitoring, alerts, controls, and processes that are part of Snowflake's comprehensive security framework."[10]

33.    Snowflake also recognizes the importance of maintaining adequate data security for its cloud computing platform users: "In today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business." Snowflake goes on to recommend a list of data security solutions that companies can implement; a list that includes Identity and Access Management ("IAM") strategies. [11]

---

[9] *Key Concepts & Architecture*, SNOWFLAKE, https://docs.snowflake.com/en/user-guide/intro-key-concepts (last visited Aug. 2, 2024).
[10] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security/ (last visited Aug. 2, 2024).
[11] *Id.*

34.    IAM systems apply individualized access controls through, *inter alia*, authentication such as MFA.[12] MFA is an electronic authentication method "that requires more than one distinct authentication factor" for a user to be granted access to a website or application.[13] Examples of MFA include the combination of both an account password and a single-use password sent via text message to a user's mobile phone in order to access an account.

35.    MFA has become an "increasingly important" piece of IAM strategies as standard one-factor authentication, which relies on only usernames and passwords, is easy to break. Indeed, compromised login credentials are a leading cause of data breaches, and MFA adds an extra layer of protection. So "[e]ven if hackers steal a password, it won't be enough to gain unauthorized access to a system."[14]

36.    Even though Snowflake supports MFA to provide increased security for its customers accessing the Snowflake platform and recommends that its customers implement MFA, Snowflake did not require its customers, including Advance Stores, to use MFA or automatically enroll its customers, including

---

[12] Matthew Kosinski and Amber Forrest, *What is IAM?*, IBM (Jan. 22, 2024), https://www.ibm.com/topics/identity-access-management.
[13] *Id.*
[14] *Id.*

Advance Stores, into MFA prior to the Data Breach.[15]  Nor did Advance Stores enroll in Snowflake's MFA in order to access its Snowflake account.

## C.    The Data Breach.

37.    On or about May 23, 2024, Advance Stores discovered that an unauthorized third party had gained access to its Snowflake account.

38.    Following an investigation, Advance Stores discovered that the unauthorized third-party had accessed and/or exfiltrated information from its Snowflake account between April 14 and May 24, 2024, that included the PII of potential job applications, including individuals' names, dates of birth, Social Security numbers, and driver's license or other government issued identification numbers.[16]

39.    At or about this same time, Snowflake also became aware of unauthorized access to certain customer accounts on its data cloud.[17]

40.    Following Snowflake's discovery of the Data Breach, Snowflake commenced an investigation into the unauthorized access. To aid in Snowflake's

---

[15]  *Multi-factor authentication (MFA)*, SNOWFLAKE, https://docs.snowflake.com/user-guide/security-mfa (last visited Aug. 2, 2024).

[16]  *Advance Auto Parts Sample Data Breach Notification*, S.C. DEP'T OF CONSUMER AFFS. (July 10, 2024), https://consumer.sc.gov/sites/consumer/files/Documents/Security%20Breach%20Notices/AdvanceStoresCompanyInc.pdf

[17]  Brad Jones, *Detecting and Preventing Unauthorized User Access*, SNOWFLAKE (originally published May 30, 2024; last updated June 10, 2024), https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-user-access/8967.

investigation into the cause of the Data Breach, Snowflake engaged third-party cybersecurity firm, Mandiant, who subsequently uncovered "a threat campaign targeting Snowflake customer database instances with the intent of data theft and extortion."[18]

41.     According to Mandiant, the threat actor, UNC5537, was able to gain access to Snowflake customer accounts via stolen customer credentials, enabling the threat actor to gain access to the affected customer accounts and the "export of a significant volume of customer data."[19]

42.     Mandiant has also determined that the Data Breach is the result of the threat actors using credentials previously stolen via infostealer malware to compromise Snowflake customer accounts that did not have MFA enabled.[20]

43.     In light of the Data Breach, Snowflake itself has recommended that its customers, including Advance Stores, immediately take the following steps in light of the Data Breach: (1) enable multifactor authentication; (2) reset and rotate all Snowflake account credentials; and (3) set up network rules that only allow authorized users or traffic from trusted locations to access Snowflake accounts.

---

[18] Mandiant, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, GOOGLE CLOUD: BLOG (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion.
[19] *Id.*
[20] *Id.*

44.    Following the Data Breach, on or about June 5, 2024, the threat actors responsible for the unauthorized access and exfiltration began advertising for sale, three terabytes of data stolen from Advance Stores' Snowflake account, including information related to Advance Stores' employees and job applicants. The stolen information was advertised for $1.5 million.[21]

45.    Despite the unauthorized access to Advance Stores' Snowflake account starting on April 14, 2024, and the threat actor advertising for sale the stolen PII on June 5, 2024, Advance Stores did not begin notifying impacted individuals of the Data Breach until July 10, 2024, nearly three months after the Data Breach began.[22]

46.    According to Advance Stores' notification to the Maine Attorney General, the PII of approximately 2.3 individuals was compromised in the Data Breach.[23]

**D.    The Value of PII and Effects of Unauthorized Disclosure.**

47.    Snowflake, one of the largest data cloud service providers in the world, certainly knew the value of the data it stored, the data's sensitive nature, and the

---

[21] Lawrence Abrams, *Advance Auto Parts confirms data breach exposed employee information*, BLEEPING COMPUTER (June 19, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-confirms-data-breach-exposed-employee-information/.
[22] *Id.*
[23] Off. of the Me. Att'y Gen., *Data Breach Notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a6279ea-12a4-47c8-855e-9ce509f5a2b2.html (last visited Aug. 2, 2024).

disastrous consequences for its corporate customers and individual consumers should this data be compromised.

48.    Similarly, Advance Stores, one of the country's largest automotive parts retailers, certainly knew the value of the data it collected and stored from potential job applicants and employees in its account on the Snowflake platform, the data's sensitive nature, and the disastrous consequences for job applicants and employees should this data be compromised.

49.    As evidenced by their data security promises, Defendants also knew that a breach of the Snowflake platform, and exposure of the personal data it contains, would result in the increased risk of identity theft and fraud for the individuals whose PII was compromised.

50.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at third-party service providers, including Progress Software Corporation, Fortra, and Accellion.

51.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[24]

---

[24] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SEC. (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

52.     Hackers and cybercriminals often trade stolen PII on the cyber black market for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. Here, the hackers responsible for the Data Breach have already advertised some of the stolen information for sale on the dark web.

53.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities. In 2023, there were 3,205 publicly disclosed data compromises, affecting over 353 million victims. The U.S. specifically saw a 72% increase in data breaches from the previous all-time high in 2021 and a 78% increase over 2022.[25]

54.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased in recent years. For instance, in 2019, roughly 3.5 million people reported some form of identity theft, fraud, or other consumer complaint compared to 5.4 million people in 2023.[26]

---

[25] *2023 Data Breach Report*, IDENTITY THEFT RES. CTR. (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[26] *Facts + Statistics: Identity theft and cybercrime*, INS. INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Key%20Facts (last visited Aug. 1, 2024).

55.    Cloud storage databases are prime targets for cybercriminals. It is estimated that more than 60% of the world's corporate data is stored in the cloud, making the cloud a highly attractive target for cybercriminals.[27]

56.    Indeed, "[i]n 2023, over 80% of data breaches involved data stored in the cloud. That is not just because the cloud is an attractive target. In many cases, it is also an easy target due to cloud misconfiguration – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups."[28]

57.    According to the National Security Agency, "'cloud misconfigurations are the most prevalent cloud vulnerability' and can be exploited by hackers to access cloud data and services."[29]

58.    The consequences of Defendants' failure to keep Plaintiff's and Class members' PII secure are long-lasting and severe. Indeed, the breadth of the data compromised in the Data Breach makes the information particularly valuable to cyber criminals and leaves Plaintiff and Class members especially vulnerable to identity theft, fraud and more.

---

[27] Stuart Madnick, *Why Data Breaches Spiked in 2023*, HARVARD BUS. REV. (Feb. 19, 2024), https://hbr.org/2024/02/why-data-breaches-spiked-in-2023.
[28] *Id.*
[29] *Id.*

16

59.   **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

60.   The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[30]

---

[30] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

61.    Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

62.    **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

63.    For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

64.    Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the

18

type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

65.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

66.    The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

67.    Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay

later frauds.[31] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[32]

68.    A 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[33]

69.    As high-profile technology and retail companies that collect and store vast amounts of PII, Defendants were uniquely positioned to ensure the safety of the PII stored on the Snowflake platform.

70.    Defendants also knew or should have known the importance of safeguarding the PII collected and stored on the Snowflake platform and of the foreseeable consequences if their data security systems were breached. Defendants

---

[31] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[32] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[33] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

failed, however, to take adequate cybersecurity measures to prevent the Data Breach exfiltration of Plaintiff's and Class members' PII from occurring.

**E.    Defendants Failed to Comply with FTC Guidelines and Industry Best Practices.**

71.    Defendants are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

72.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[34]

73.    In 2016, the FTC updated its publication titled "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses.[35] The guidelines recommend the following:

---

[34] U.S. Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 2, 2024).
[35] *See* U.S. Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Aug. 2, 2024).

a.   businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b.   businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c.   businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d.   businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e.   businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

74.   In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

75.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the

---

[36] *Supra* note 34.

FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

76.     Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices described above. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class members' PII by threat actors.

77.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

78.     Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[37]

79.     The NIST's publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security

---

[37] *See* Nat'l Inst. of Standards and Tech., *Framework for Improving Critical Infrastructure Cybersecurity*, at 24–44 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

controls, network monitoring, breach detection, and incident response.[38] Upon

information and belief, Defendants failed to adhere to the NIST guidance.

80.    Further, Snowflake itself recommends that companies implement the

following data security measures, including:

      a.      implementing data governance tools that "provide visibility into what data exists, where it is, and who accessed it;"

      b.      masking sensitive information to ensure that is properly protected;

      c.      encrypting data to convert text into an unreadable format without the decryption key;

      d.      employing endpoint protection to identify breaches as the occur and "lock down the affected endpoints;"

      e.      employing IAMs to manage users' digital identities and control user access to data;

      f.      engaging in regular data security audits to identity vulnerabilities; and

      g.      implementing data governance polices "that govern[] how data is made available, used, and secured."[39]

---

[38] *Id.* at 26–43.
[39] *Supra* note 10.

81.     Upon information and belief, Defendants' failure to protect Plaintiff's and Class members' PII is a result of Defendants' failure to adopt reasonable safeguards required by the FTC, NIST, industry best practices, and Snowflake's own data security recommendations. This includes Snowflake's failure to require customers to implement MFA to access their Snowflake accounts and Advance Stores' failure to enroll in MFA to access its own Snowflake account.

82.     Defendants were, at all times, fully aware of their obligations to protect the PII of Plaintiff and Class members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F.    Plaintiff and Class Members Suffered Damages.**

83.     The ramifications of Defendants' failure to keep individuals' PII secure are long lasting and severe. Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in

a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

84.     In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[40] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class members) must take after a data breach, like Defendants, are both time-consuming and of only limited and short-term effectiveness.

85.     The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[41]

---

[40] U.S. GOV'T ACCOUNTABILITY OFF., GAO-19-230, DATA BREACHES: RANGE OF CONSUMER RISKS HIGHLIGHTS LIMITATION OF IDENTITY THEFT SERVICES (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.
[41] *See* U.S. Fed. Trade Comm'n, *Identity Theft Victim Checklist*, https://www.identitytheft.gov/Steps (last visited Aug. 2, 2024).

86.    Consumer fraud and identity theft are only increasing. Recently published FTC data show that consumers reported losing more than $10 billion to fraud in 2023, representing a 14% increase over reported losses in 2022. In 2023, there were more than 1 million reports of identity theft received through the FTC's IdentityTheft.gov website.[42]

87.    Besides the monetary damage sustained, consumers may also spend anywhere from one day to more than six months resolving identity theft issues.[43]

88.    Ultimately, the time that victims spend monitoring and resolving identity theft issues takes an emotional toll. In 2021, the Department of Justice found that approximately 80% of victims of identity theft experienced some type of emotional distress, and more than one-third of victims experienced moderate or severe emotional distress.[44]

89.    Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

---

[42] *As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, U.S. FED. TRADE COMM'N: PRESS RELEASES (Feb. 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.
[43] Erika Harrell, *Victims of Identity Theft, 2018*, Bureau of Just. Stat., U.S. DEP'T OF JUST., NCJ 256085 (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.
[44] *Id.*

90.    As a result of Defendants' failure to prevent the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their highly valuable PII; the imminent and certainly impending injury flowing from fraud and identity theft posed by their PII being placed in the hands of criminals; damages to and diminution in value of their PII that was entrusted to Defendants with the understanding the Defendants would safeguard the PII against disclosure; and continued risk to Plaintiff's and Class members' PII, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the PII with which they were entrusted.

**G.    Plaintiff's Experience.**

91.    Plaintiff is a former employee of Advance Stores. During Plaintiff's job application process and employment, Plaintiff was required to entrust Advance Stores with his PII. Upon information and belief, the PII Advance Stores collected and stored about Plaintiff was entrusted by Advance Stores to Snowflake, stored in Advance Stores' Snowflake account, and compromised in the Data Breach.

92.    Plaintiff received a data breach letter dated July 10, 2024, from Advance Stores informing him that his PII entrusted to Advance Stores was compromised in the Data Breach.

93.     Since the Data Breach, Plaintiff has had to spend his valuable time and effort taking steps to mitigate the risk of misuse of his PII, including spending time monitoring his financial accounts and changing his passwords to his financial accounts. Plaintiff would not have had to engage in these time intensive measures but for the Data Breach.

94.     Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of his PII; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

95.     Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

96.     In addition, knowing that hackers accessed and likely exfiltrated his PII and that this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## CLASS ACTION ALLEGATIONS

97.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Data Breach of which Advance Stores noticed on or about July 10, 2024.

98.    Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

99.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

100.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to, the files implicated in the Data Breach. Based upon public filings, the Class includes approximately 2.3 million individuals.

101.   **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class members. Such common questions include, but are not limited to:

    a.    whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class members;

    b.    whether Defendants were negligent in collecting and storing Plaintiff's and Class members' PII;

    c.    whether Defendants had duties not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

    d.    whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class members' PII;

    e.    whether Defendants failed to adequately safeguard the PII of Plaintiff and Class members;

    f.    whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class members' PII;

    g.    whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    h.    whether Plaintiff and Class members are entitled to damages as a result of Defendants' wrongful conduct; and

i.    whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

102.    **Typicality.** Plaintiff's claims are typical of the claims of the Class members. The claims of Plaintiff and Class members are based on the same legal theories and arise from the same failure by Defendants to safeguard their PII. Plaintiff and Class members directly and/or indirectly entrusted Defendants with their PII, and it was subsequently compromised by an unauthorized third party.

103.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

104.    **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties

than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

105. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their duty, then Plaintiff and each Class member suffered damages by that conduct.

106. **Injunctive Relief.** Defendants have acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

107. **Ascertainability.** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Defendants' books and records.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**
**(Against Both Defendants)**

108.  Plaintiff restates and realleges all preceding allegations as if fully set forth herein.

109.  Defendants owed a duty under common law to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting their PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

110.  Specifically, this duty included, *inter alia*: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class members' PII was adequately secured and protected; (b) implementing processes that would detect a breach of their security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

111.  Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

112.  Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable

34

and probable victims of any inadequate security practices on the part of Defendants. By collecting, storing, and processing valuable PII that is routinely targeted by cybercriminals, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

113.    Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately restrict access to their computer networks, servers, and/or cloud computing accounts that held individuals' PII.

114.    Defendants also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyberattacks such as the Data Breach that target third-party service providers.

115.    Defendants breached the duties owed to Plaintiff and Class members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and

monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

116. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class members, their PII would not have been compromised.

117. As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have suffered injuries including:

    a.    theft of their PII;

    b.    unauthorized charges to their bank accounts;

    c.    costs associated with canceling and ordering new payment cards;

    d.    time spent reporting fraudulent activity;

    e.    costs associated with requesting credit freezes;

    f.    costs associated with the detection and prevention of identity theft;

    g.    costs associated with purchasing credit monitoring and identity theft protection services;

h.   lowered credit scores resulting from credit inquiries following fraudulent activities;

i.   costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

j.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

l.   damages to and diminution in value of their PII entrusted to Snowflake with the mutual understanding that Snowflake would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others; and

m.   continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff and Class members.

118.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

37

## SECOND CAUSE OF ACTION
### NEGLIGENCE PER SE
**(On Behalf of Plaintiff and the Class)**
**(Against Both Defendants)**

119.   Plaintiff restates and realleges all preceding factual allegations as if fully set forth herein.

120.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Snowflake of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Snowflake's duty.

121.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature of their businesses and the amount of PII they generate, collect obtained and stored.

122.   Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

123.   Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

124.   Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses that, as a result of their failure to employ reasonable data

security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class members.

125.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have suffered injuries, including those identified in paragraph 117 above.

126.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**
**(Against Advance Stores)**

127.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

128.   Advance Stores required Plaintiff and Class members to provide their PII as a condition of applying for and maintaining employment.

129.   In doing so, Plaintiff and Class members entered into implied contracts with Advance Stores by which Defendant agreed to safeguard and protect such PII, keep such PII secure and confidential.

130.   When entering into these implied contracts, Plaintiff and Class members reasonably believed and expected that Advance Stores' data security

practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class members' PII.

131.   Indeed, implicit in these exchanges was a promise by Advance Stores to ensure the PII of Plaintiff and Class members in its possession would be used for the purposes of job applications and employment and that Advance Stores would take adequate measures to protect Plaintiff's and Class members' PII.

132.   It is clear by these exchanges that the parties intended to enter into implied agreements supported by mutual assent. Plaintiff and Class members would not have disclosed their PII to Advance Stores but for the prospect of Advance Stores' promise of adequate data security. Conversely, Advance Stores presumably would not have taken Plaintiff's and Class members' PII if it did not intend to adequately protect their PII.

133.   Plaintiff and Class members would not have provided their PII to Advance Stores had they known that Advance Stores would not safeguard their PII as promised.

134.   Plaintiff and Class members fully performed their obligations under their implied contracts with Advance Stores.

135.   Advance Stores breached its implied contracts with Plaintiff and Class members by failing to safeguard Plaintiff's and Class members' PII.

136.    As a direct and proximate result of Advance Stores' breach of implied contract, Plaintiff and Class members have suffered injuries, including those identified in paragraph 117 above.

137.    As a direct and proximate result of Advance Stores' breach of contract, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**
**(Against Advance Stores)**

138.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

139.    Plaintiff brings this claim in the alternative to his breach of implied contract claim above.

140.    By engaging in the conduct described in this Complaint, Advance Stores has knowingly obtained and derived benefits from Plaintiff and Class members at Plaintiff's and Class members' expense, namely the profits gained from their applications for employment and their employment, such that it would be inequitable and unjust for Defendant to retain.

141.    By engaging in the acts and failures to act described in this Complaint, Advance Stores has been knowingly enriched by the savings in costs that should have been reasonably expensed to protect the PII of Plaintiff and the Class. Advance

41

Stores knew or should that known that theft of employees' and prospective employees' PII could happen, yet it failed to take reasonable steps to pay for the level of security required to have prevented the theft of its job applicants' and employees' PII.

142.   Advance Stores' failure to direct profits derived from Plaintiff's and Class members' employment or applications for employment toward safeguarding Plaintiff's and Class members' PII constitutes the inequitable retention of a benefit without payment for its value.

143.   Advance Stores will be unjustly enriched if it is permitted to retain the benefits derived after the theft of Plaintiff's and Class members' PII.

144.   The benefit conferred upon, received, and enjoyed by Advance Stores was not conferred gratuitously, and it would be inequitable and unjust for Advance Stores to retain the benefit.

145.   Plaintiff and Class members have no adequate remedy at law.

146.   As a direct and proximate result of Advance Stores' conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 117 above.

147.   Advance Stores should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**
**(Against Snowflake)**

148.  Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

149.  Plaintiff and Class members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Snowflake and that was ultimately accessed or compromised in the Data Breach.

150.  Plaintiff and Class members conferred a monetary benefit upon Snowflake in the form of labor provided to Snowflake customers, such as Advance Auto. Snowflake's business model would not exist save for the need to ensure the security of Plaintiff's and Class members' PII in order to provide cloud computing services to its customers.

151.  The relationship between Snowflake and Plaintiff and Class members is not attenuated, as Plaintiff and Class members had a reasonable expectation that the security of their PII would be maintained when they provided their information to Snowflake's customers.

152.  By engaging in the conduct described in this Complaint, Snowflake has knowingly obtained and derived benefits from Plaintiff and Class members at Plaintiff's and Class members' expense, namely the profits gained in exchange for

the use of Snowflake's services, such that it would be inequitable and unjust for Defendant to retain them.

153.   By engaging in the acts and failures to act described in this Complaint, Snowflake has been knowingly enriched by the financial gain. This profit should have been reasonably expended to protect the PII of Plaintiff and the Class. Snowflake knew or should that known that theft of consumer PII was a constant threat, yet it failed to take reasonable steps to ensure the level of security required to have prevent the theft of consumers PII.

154.   Snowflake's failure to direct profits derived from Plaintiff's and Class members' patronage of its customers toward safeguarding Plaintiff's and Class members' PII constitutes the inequitable retention of a benefit without payment for its value.

155.   Snowflake will be unjustly enriched if it is permitted to retain these benefits following the theft of Plaintiff's and Class members' PII.

156.   Snowflake's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class members' PII, while at the same time failing to securely maintain that information from unauthorized access and compromise.

157.   Plaintiff and Class members have no adequate remedy at law.

158.   As a direct and proximate result of Snowflake's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, including those identified in paragraph 117 above.

159.   Snowflake should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**
**(Against Both Defendants)**

160.   Plaintiff restates and realleges all proceeding factual allegations as if fully set forth herein.

161.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

162.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff alleges that Defendants still possess Plaintiff's and Class members' PII, and that Defendants'

data security measures remain inadequate. Furthermore, Plaintiff and Class members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

163.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, *inter alia*, the following:

> a.    Defendants owe a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and
>
> b.    Defendants continue to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class members' PII.

164.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

165.    If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at either of Defendants. The risk of another such breach is real, immediate, and substantial. If another breach of Snowflake's platform occurs, Plaintiff and Class members will not have an adequate remedy at law because the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

166.   The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal. Defendants have a pre-existing legal obligation to employ such measures.

167.   Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by possibly preventing another data breach at either Defendant, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

A.     for an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    for an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    for damages in an amount to be determined by the trier of fact;

D.    for an order of restitution and all other forms of equitable monetary relief;

E.    declaratory and injunctive relief as described herein;

F.    awarding Plaintiff reasonable attorneys' fees, costs, and   expenses;

G.    awarding pre- and post-judgment interest on any amounts awarded; and

H.    awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated this 7th day of August 2024

*(Signature on following page)*

Respectfully Submitted,

*/s/John Heenan*
John Heenan
John@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091

Gary F. Lynch (*pro hac vice* forthcoming)
Patrick D. Donathen (*pro hac vice* forthcoming)
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
gary@lcllp.com
patrick@lcllp.com

*Attorneys for Plaintiff and the Proposed Class*

49